UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
BRIAN J. SKORNICK,

                          Plaintiff,

         - against -                               **OPINION & ORDER**

PRINCIPAL FINANCIAL GROUP, PRINCIPAL LIFE       No. 18-CV-4324 (CS)
INSURANCE COMPANY and BROOKLYN PUBLIC
LIBRARY,

                         Defendants.
------------------------------------------------------------------------x

<u>Appearances</u>

Katie Wendle
Baker, Leshko, Saline & Drapeau, LLP
White Plains, New York
*Counsel for Plaintiff*

Robert P. Lesko
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
Florham Park, New Jersey
*Counsel for Defendant Principal Life Insurance Company*

Clifford R. Atlas
Charles F. Seemann III
Jackson Lewis P.C.
New York, New York
*Counsel for Defendant Brooklyn Public Library*

<u>Seibel, J.</u>

       Before the Court is Plaintiff's motion to remand this case to state court. (Doc. 36.)

1

**I. BACKGROUND**[1]

On April 5, 2018, Plaintiff Brian J. Skornick brought this action in the New York State Supreme Court in Westchester County to recover disability benefits under a policy he purchased from Defendant Principal Financial Group ("Principal") through his employer, Defendant Brooklyn Public Library (the "Library"). (Wasserman Aff. ¶¶ 2-3; Compl. ¶¶ 4-5.) Plaintiff alleges that he completed all of the required paperwork, paid the required premiums – at least some of which were deducted from Plaintiff's earnings or otherwise paid through the Library – and was eligible for benefits, yet Principal has refused to honor his claim for disability benefits or recognize that he has a viable life insurance policy. (Compl. ¶¶ 7-11.) Plaintiff's complaint alleges claims for fraud, breach of contract, negligence, and violation of New York General Business Law § 349 against Principal, and a claim of negligence against the Library. (*Id.* ¶¶ 18-31.)

---

[1] The facts recited herein are drawn from the Complaint. (Doc. 1-1 at 9-15 ("Compl.").) Doc. 1-1 comprises several documents that are not consecutively paginated, so citations to Doc. 1-1 refer to the page numbers generated by the Court's Electronic Case Filing ("ECF") System. In resolving this motion, the Court treats all facts alleged in the Complaint as true. *See Fed. Ins. Co. v. Tyco Int'l Ltd.*, 422 F. Supp. 2d 357, 391 (S.D.N.Y. 2006) ("When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff.") (citation and internal quotation marks omitted). In addition, for purposes of determining the validity of Defendants' removal, the Court also considered the exhibits and affidavit attached to Principal's notice of removal, (Doc. 1), the Affirmation of Katie Wendle, (Doc. 37 ("Wendle Affirm.")), in support of Plaintiff's motion to remand, and the Affidavit of Chloe Wasserman, (Doc. 41 ("Wasserman Aff.")), in opposition to that motion. *See Arseneault v. Congoleum Corp.*, No. 01-CV-10657, 2002 WL 472256, at *6 (S.D.N.Y. Mar. 26, 2002) ("The Second Circuit . . . has said that, on jurisdictional issues, 'federal courts may look outside [the] pleadings to other evidence in the record,'" and therefore the court considers "material outside of the pleadings" submitted on motion to remand.) (citation omitted) (second alteration in original), *reconsideration granted on other grounds*, 2002 WL 531006 (S.D.N.Y. Apr. 8, 2002).

On May 15, 2018, Principal removed the case to this Court under 28 U.S.C. §§ 1331 and 1441(a), claiming that the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, governs Plaintiff's claim, and that therefore the case involved a federal question. (Doc. 1 ¶¶ 8-9.) On May 25, 2018, the Library consented to removal. (Doc. 5.) Plaintiff now moves to remand the case to state court, arguing that no federal question exists because the Library's disability plan under which Plaintiff alleges he is entitled to benefits is a "governmental plan" within the meaning of section 3(32) of ERISA and is therefore exempt from compliance with Title I of that statute. *See* 29 U.S.C. § 1003(b)(1).

## II. LEGAL STANDARD

An action filed in state court may be properly removed by a defendant if "the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. As a general matter, removal jurisdiction must be "strictly construed," *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002), and any doubts should be resolved against removability "out of respect for the limited jurisdiction of the federal courts and the rights of states," *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007). Therefore, "[a] party seeking removal bears the burden of showing that federal jurisdiction is proper." *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 327 (2d Cir. 2011).

## III. DISCUSSION

> A civil action may be brought [under ERISA] . . . by a participant or a beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B). But ERISA does not apply to a "governmental plan," 29 U.S.C. § 1003(b)(1), which is defined as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing," 29 U.S.C. § 1002(32). Thus, if the plan Plaintiff purchased through the Library is a governmental plan not covered by ERISA, there is no basis for federal jurisdiction and the case should be remanded to state court.

Because ERISA is a federal statute, courts interpret the government plan exception by reference to federal law. *See Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 915 (2d Cir. 1987). And because ERISA is "remedial legislation," it "should be liberally construed in favor of protecting participants in employee benefits plans." *Parise v. Riccelli Haulers, Inc.*, 672 F. Supp. 72, 74 (N.D.N.Y. 1987) (internal quotation marks omitted).

Plaintiff does not allege that the Library is a government or political subdivision, (*see, e.g.*, Doc. 38 ("P's Mem.") at 7-8), so the question is whether it is an "agency or instrumentality" of the government of New York City (the "City") or the Borough of Brooklyn (the "Borough"). In determining whether a party is an agency or instrumentality of a political subdivision, the Court considers six factors:

> (1) whether it is used for a governmental purpose and performs a governmental function; (2) whether performance of its function is on behalf of one or more states or political subdivisions; (3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner; (4) whether control and supervision of the organization is vested in public authority or authorities; (5) if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and (6) the degree of financial autonomy and the source of its operating expenses.

*Rose*, 828 F.2d at 918. In considering these factors – bearing in mind that the "party seeking removal bears the burden of showing that federal jurisdiction is proper," *Montefiore*, 642 F.3d at

4

327 – I find that the Library is not an agency or instrumentality of the government for purposes of the ERISA exception.

The first *Rose* factor asks whether the Library is used for a governmental purpose or performs a governmental function. This test is not as simple as it sounds. The question cannot turn simply on whether the organization does something beneficial for the people of a political subdivision. If that were the test, numerous organizations – from the Little League to Planned Parenthood – would be considered to serve a governmental purpose. The test must mean something more specific: whether the organization does something the government would otherwise have to do, and whether it does it in a way similar to how the government would do it.

In *Rose*, the Second Circuit found that the Metropolitan Transportation Authority ("MTA") performed a governmental function because the statute that created the MTA expressly stated that the MTA was "in all respects for the benefit of the people of the state of New York" and that it performed "an essential governmental function in carrying out its purpose and in exercising the powers granted by this title." *Rose*, 828 F.2d at 916 (citing N.Y. Pub. Auth. Law § 1264) (internal quotation marks omitted). But Plaintiff has pointed to no comparable language appearing in the statute that created the Library.[2] (*See* P's Mem. at 1-3.) Even today, New York

---

[2] Before 1901, Andrew Carnegie offered five million dollars to the City of New York to establish public libraries. *Brooklyn Pub. Library v. City of N.Y.*, 250 N.Y. 495, 497 (1929). As a result, the New York State legislature enacted chapter 580 of the Laws of 1901, which authorized the City to enter into contracts with Carnegie or his representatives to build and maintain new libraries. *Id.* At that time there were two library corporations in Brooklyn – the Brooklyn Library, a private subscription service, and the Public Library – which were consolidated into the present Brooklyn Public Library under chapter 606 of the Laws of 1902, amended by chapter 500 of the laws of 1903. *Id.*; *Brooklyn Pub. Library v. Craig*, 194 N.Y.S. 715 (App. Div. 1922). The City and the Library entered into a formal contract in 1903, under which "the city recognized and accepted the separate corporate identity and existence of the Brooklyn Public Library, and envisaged the survival or devolution into it of the powers of self-control possessed by the merged organizations." *Craig*, 194 N.Y.S. at 715. The City agreed to appropriate funds for the maintenance and administration of the library, *id.*, and the Brooklyn Public Library took

5

City's charter expressly excludes the Library from its definition of agency. *See* N.Y.C. Charter § 2601(2) ("[a]gency . . . shall not include . . . any corporation or institution maintaining or operating a public library.").

The absence of an express statutory provision that mirrors the statutory provision in *Rose* might not alone doom Plaintiff's arguments. But, in addition, the Library operates for tax purposes as a 501(c)(3) non-profit organization. (Wendle Affirm. Ex. H at 7.)[3] It files Form 990 with the Internal Revenue Service ("IRS"), identifying itself as a public charity "that normally receives a substantial part of its support from a governmental unit or from the general public." (*Id.* Ex. G at 23.) It is not designated as a "political subdivision," which is described in the Internal Revenue Manual as "an organization [that] possess[es] a sovereign power (traditionally regarded as the power to tax, to condemn property, or to police or regulate)." Internal Revenue Manual 7.26.2.6.1 (Dep't Treasury 2014). The Library cannot exercise those government functions or powers even though it receives substantial government funding. *See Hollenbaugh v. Carnegie Free Library*, 545 F.2d 382, 383 (3d Cir. 1976) ("[I]t [cannot] be said that the operation of a library constitutes private performance of a function traditionally associated with sovereignty."). The *Rose* test is borrowed from the IRS, *see Rose*, 828 F.2d at 917-18, so the Library's tax status is telling.

Moreover, New York Education Law § 254 authorizes the Board of Regents to fix standards of library service for public libraries and free association libraries which receive public funds. The Board of Regents issues charters to four types of libraries: (1) association libraries;

---

over the property, as well as the direction and control, of the two other libraries, *Brooklyn Pub. Library*, 250 N.Y. at 498.

[3] Citations to Wendle Affirm. Ex. H refer to the page numbers generated by the Court's ECF System.

(2) municipal public libraries; (3) school district public libraries; and (4) special district public libraries. *Types of Public Libraries: A Comparison*, N.Y. State Library, http://www.nysl.nysed.gov/libdev/libs/pltypes.pdf (last visited Apr. 16, 2019). An association library is "a library established and controlled, in whole or in part, by a group of private individuals operating as an association, close corporation or as trustees under the provisions of a will or deed of trust," while a "public" library is defined as a library "established for free public purposes by official action of a municipality or district or the legislature, where the whole interests belong to the public." N.Y. Educ. Law § 253. The Board of Regents – after considering such factors as how the Library was established, its funding sources, and the composition of its Board of Trustees – issued the Library a charter for an association library, not a public library. *See Brooklyn Public Library*, N.Y. State Library, http://www.nysl.nysed.gov/libdev/libs/publibs/3brook.htm (last visited Apr. 16, 2019). While not outcome determinative, the Board of Regent's decision to designate the Library as an association library instead of a public library suggests that the Library's fundamental features are not governmental.

Plaintiff argues that the Library's mission statement, vision statement, and statutory purpose dictate that the Library is used for a governmental function: the "education and intellectual advancement" of Brooklyn residents. (P's Mem. at 15-16.) In other words, because the Library provides educational opportunities to Brooklyn residents, Plaintiff contends that the Library has undertaken the governmental function of educating the citizens of Brooklyn. In support of his argument, Plaintiff cites to *Allugard v. Principal Life Insurance Co.*, 685 F. Supp. 2d 947, 955 (D. Ariz. 2010), where the court determined that a private company conducting research to improve education was performing a governmental function. But that case is not

7

binding or convincing. The Library provides no cases that state that providing free educational opportunities is tantamount to performing a governmental function. Numerous private institutions – such as museums – provide educational opportunities for the public, and courts do not consider them to be performing a governmental function. *See e.g.*, *Schoeps v. Museum of Modern Art*, 603 F. Supp. 2d 673, 675 n.1 (S.D.N.Y. 2009) (Museum of Modern Art not a governmental agency); *Forbes v. City of N.Y.*, No. 05-CV-7331, 2008 WL 3539936, at *6-7 (S.D.N.Y. Aug. 12, 2008) (Lincoln Center does not provide public function through its agreement with New York City to manage Damrosch Park). Further, while patrons of a library can surely educate themselves there, libraries also provide recreational, entertainment, and social opportunities, at least the latter two of which do not comfortably fit our common conception of a governmental function. And even if they did, the Library does not provide them in the way a government would. It has not taken on from the City the responsibility of educating the citizens of Brooklyn, and it does not tax, legislate, or police. Although the Library's ties to government may be closer than those of some City contractors – say, a bus company that contracts to transport schoolchildren – its relationship to the City, and its concomitant ability to run the libraries of Brooklyn, are creations of contract. *See Brooklyn Pub. Library*, 250 N.Y. at 499-500 (Library is "a distinct and separate corporation, receiving budgetary contributions from the city") (citation and internal quotation marks omitted). I thus conclude that the Library does not perform a governmental function. *Cf. N.Y. Pub. Library v. N.Y. State Pub. Emp't Relations Bd.*, 357 N.Y.S.2d 522, 533 (App. Div. 1974) (New York Public Library not government or public employer within meaning of Taylor Act, Civil Service Law § 201; "the Library . . . merely provide[s] a service, which although of public interest and benefit, is not the equivalent of the exercise of governmental powers"), *aff'd*, 37 N.Y.2d 752 (1975).

As to the second *Rose* factor, Plaintiff essentially repeats his argument on the first *Rose* factor, *i.e.*, that because the Library provides free educational or other benefits for the people of Brooklyn, it necessarily performs its function on behalf of the Borough. (P's Mem. at 16.) But Plaintiff has conflated *Rose's* concept "on behalf of one or more states or political subdivisions" with an amorphous concept of performing "for the benefit of" the people of Brooklyn. Plaintiff has not cited authority for the proposition that providing free educational benefits to the public is a function performed on behalf of a political subdivision. Adopting Plaintiff's logic – that an entity that benefits a city's or state's residents performs that function "on behalf of" a political subdivision – would result in large swaths of non-profit organizations avoiding ERISA's reach simply because they provide services that benefit the public. If Congress had intended to exclude such organizations from ERISA's ambit, it could easily have done so in unambiguous terms. Congress's decision not to do so is strong evidence that organizations like the Library were intended to be covered by ERISA. Thus, the second *Rose* factor also favors Defendants.

As to the third *Rose* factor, Plaintiff argues that the City and the Borough have the powers and interests of an owner because the City provides funding to the Library, Library employees can participate in the New York State Retirement System, the City has exercised eminent domain to provide real estate for the Library, and the City audits the funds the City provides to the Library. (P's Mem. at 17-19.) But these arguments fail too. The Library receives its funding as a matter of contract, (Wasserman Aff. Ex. 2 at 3), and the government's funding of an institution or entity is not the same as government's ownership of the institution or entity, *cf. Rosenthal v. Roberts*, No. 04-CV-5205, 2005 WL 221441, at *7 (S.D.N.Y. Jan. 28, 2005) (despite receiving government funds, New York Public Library and Metropolitan Museum of Art "do not constitute political subdivisions as that term is commonly understood by . . .

9

federal courts"). That the Library's employees can participate in the New York State Employees' Retirement System was also agreed upon by contract, (Wasserman Aff. Ex. 2 at 3), and does not suffice to render Library employees the equivalent of state, let alone city, employees. In any event, the insurance plans at issue here are funded solely by employee contributions, are offered by the Library and not the City of New York, and are not associated with the New York State Retirement System. (Wasserman Aff. ¶¶ 2-5.) And Plaintiff's argument that the City's exercise of eminent domain on the Library's behalf suggests the Library's "status as an agency or instrumentality of the City of New York" is unpersuasive because the City is contractually obligated to provide for the maintenance and construction of libraries in Brooklyn, and it is well settled that "the government's pursuit of a public purpose will often benefit individual private parties." *Kelo v. City of New London*, 545 U.S. 469, 484 (2005). Likewise, that the City contracted for the right to audit a contractor is neither unusual nor indicative of ownership. There is simply no suggestion that the City or Borough treats the Library as an owner would; for example, the Library does its own hiring and firing, manages its own budget, and decides what books to buy and programs to offer. Thus, the third *Rose* factor also favors Defendants.

Under the fourth *Rose* factor – whether control and supervision of the organization is vested in public authority or authorities – a decision-making body that consists of publicly appointed members can be indicative of a governmental entity under the *Rose* analysis. *See Yu v. N.Y.C. Hous. Dev. Corp.*, No. 07-CV-5541, 2011 WL 2326892, at *24 (S.D.N.Y. Mar. 16, 2011) (board consisting of solely public officials and appointees of public officials satisfies Rose's

third and fourth factor). Here, as described by the Library's corporate bylaws,[4] the Board of Trustees consists of thirty-eight members, falling into three categories: (1) twelve trustees elected by the Library's Board of Trustees; (2) the Mayor, Comptroller, Brooklyn Borough President, and Speaker of the New York City Council serving as *ex-officio* trustees; and (3) twenty-two trustees, eleven of whom are appointed by the Mayor of New York City and the other eleven by the Brooklyn Borough President. (Wendle Affirm. Ex. I at 1.) Thus, twenty-six of the thirty-eight Board members fall within the same categories – government officials and political appointees – as those discussed in *Yu* as sufficient to satisfy the fourth *Rose* factor. So there is some merit to Plaintiff's arguments.

Still, courts that have considered similar questions about the relationship between the Library and New York City in other contexts likely would have sided with Defendants here. In *La Marca v. Brooklyn Public Library*, 10 N.Y.S.2d 129 (App. Div. 1939), the question presented was whether the City was liable for damages arising out of the negligence of a janitor employed to care for the library building. The Second Department affirmed dismissal of the complaint and observed, "The building was owned by the City of New York, but was operated and controlled by the Brooklyn Public Library . . . . [T]he city had no control of any part of the building, and [] the library employees were not in the employ of the city." *Id.* at 130. Similarly, in *Craig*, the Second Department noted that the library "is not a branch of the city government, but is a distinct and separate corporation, receiving budgetary contribution from the city." 194 N.Y.S. at 715. And in *New York Public Library*, the First Department, in concluding that New York City could not be considered the employer of the New York Public Library's employees, said

---

[4] The Library's bylaws were adopted as of December 18, 2007, and amended as of September 21, 2010, May 17, 2011, and February 21, 2012. (Wendle Affirm. Ex. I at 9.)

11

> [N]ot only is the [New York City Public] Library a separate and distinct body from the city, but by contract it . . . retains general control over the direction and management of its own affairs. And more specifically, by contract and in practice, the hire, discharge and promotion of the employees, as well as the supervision of their daily and over-all duties are vested in the Library through its self-perpetuating Board of Trustees. There is no proof in the record that the City interferes in these matters or has the power to do so. Hence, under all the traditional tests it is the [New York City Public] Library that is the employer and not the City.

357 N.Y.S.2d at 528. On balance, however, that most of the Board that runs the library consists of City officials or persons appointed by City officials, and the remainder are people on whom those officials or appointees have agreed, suffices to tip the fourth *Rose* factor in Plaintiff's favor.

The fifth *Rose* factor – which explores under what authority the instrumentality was created – is neutral. While the Library was created by state law, as discussed above, that legislation envisioned a contract between the Library and the City. Contracting is a routine event for the City that does not suggest that the other contracting party is a governmental entity. For example, in *Rendell-Baker v. Kohn*, the Supreme Court found that a private school, the income of which was derived primarily from public sources and which was regulated by public authorities, was not a state actor when it discharged certain employees, explaining that "[t]he school . . . is not fundamentally different from many private corporations whose business depends primarily on contracts" with the government, and whose acts "do not become acts of the government by reason of their significant or even total engagement in performing public contracts." 457 U.S. 830, 840-41 (1982). Indeed, the contract here acknowledged "the separate corporate identity and existence of" the Library. *Craig*, 194 N.Y.S. at 715.

As to the sixth *Rose* factor – the degree of financial autonomy and the source of its operating expenses – Defendants do not dispute that the Library relies on the significant financial support of the government to operate. Plaintiff has provided ample evidence of this fact, (*see,*

*e.g.*, Wendle Affirm. Ex. H at 3, 11), and is probably right that the Library "would likely not exist, but for the funding of the City," (P's Mem. at 23). But the Library exercises a sufficient degree of financial autonomy to balance that fact and render this factor neutral. As the Second Department explained,

> it seems clear that, under the various statutes delegating powers to various libraries and the contract made with the city of New York, the board of trustees of the [L]ibrary is the body charged with the duty of distributing the fund already appropriated by the board of estimate. The board of trustees was intended, both by the statutes and the contract, to have discretionary powers, so long as they were exercised in good faith, to fix the various salaries of its employees and carry out generally its administrative duties.

*Craig*, 194 N.Y.S. at 715. Therefore, despite the government's substantial financial investment in the Library, the Library maintains a great degree of financial autonomy to allocate the government funding as it sees fit.[5] This factor favors neither side.

The Department of Labor ("DOL") advisory opinions on which Plaintiff relies, (*see* P's Mem. at 11-13, 17, 20-23), are not only not binding,[6] but also inapposite as applied here. In

---

[5] Plaintiff's argument that the Office of Comptroller of New York City supervises the Library through audits, (P's Mem. at 19, 21; *see* Wendle Affirm. Ex. F), is only entitled to minimal weight. The Comptroller's Office performs audits not only of City agencies but also of City-funded entities. *See* Letter from Scott M. Stringer, N.Y.C. Comptroller, to Residents of the City of N.Y. (June 9, 2015), https://comptroller.nyc.gov/wp-content/uploads/documents/FM14_111A.pdf. The only audit reports of the Brooklyn Public Library that are published on the New York City Comptroller's website are dated June 9, 2015, May 28, 2013, May 23, 2008, and June 22, 2005. *See* New York City Comptroller Scott M. Stringer Reports, https://comptroller.nyc.gov/reports/?fwp_agency=public-library-brooklyn (last visited Apr. 16, 2019). Not only are the audits interspersed over three- or five-year intervals, but each audit report contains mere "recommendations," rather than binding direction that the Library is required to follow. The City's authority to audit does not suffice to undermine the Library's overall financial autonomy to hire, make purchases, offer programs and otherwise manage its budget.

[6] *See Montoya v. ING Life Ins. & Annuity Co.*, 653 F. Supp. 2d 344, 352 n.5 (S.D.N.Y. 2009) ("While DOL advisory opinions are not binding, the DOL is 'nonetheless a body of experience and informed judgment to which courts and litigants may properly resort for guidance and we

13

DOL Opinion 94-21A, the DOL concluded that the Carnegie Center for Literacy and Learning (the "Center") was an agency or instrumentality of the county government and that including the Center's employees in the County Employees Retirement Systems ("CERS") would not affect CERS's status as a governmental plan within the meaning of ERISA's governmental exemption. Carnegie Ctr. for Literacy & Learning, Pens. Plan Guide (CCH) Op. No. 94-21A ¶ 23,897S (June 17, 1994), 1994 WL 271163, at *1. DOL based its decision on certain features that the Center shares with the Library: the Center was created by an ordinance, its board of directors consisted mostly of political appointees, and it was funded in part by tax money. But aside from addressing a somewhat different question – the DOL considered whether the Center's participation in CERS would disqualify CERS as a "governmental plan," as opposed to the inquiry here, where I must evaluate whether the Library's plan falls within ERISA's governmental plan exemption in the first instance – the DOL advisory opinion ignores the first *Rose* factor by not analyzing whether the Center performed a governmental function and only partly addresses the sixth *Rose* factor by failing to evaluate whether the Center retained financial autonomy over its public funding. Consideration of these factors might have changed the DOL's conclusion. Further, while the Center was created by a County ordinance, there was no indication that the Center had a contract with the county. This factor, along with the advisory opinion's incomplete *Rose* analysis and the difference of the legal question addressed, renders its persuasive force minimal.

Plaintiff also cites to DOL Opinion 97-02A, where the DOL faced a similar question: whether the California State University, Hayward Foundation, Inc. (the "Foundation"), could

---

have often relied on DOL Opinion Letters for their persuasive value.'") (quoting *Gualandi v. Adams*, 385 F.3d 236, 243 (2d Cir. 2004)).

contract with the California Public Employees' Retirement System ("CalPERS") to provide for the participation of its employees as members without affecting the status of CalPERS as a governmental plan under section 3(32) of ERISA. Hayward Found., Pens. Plan Guide (CCH) Op. No. 97-02A ¶ 19,986A (Jan. 6, 1997), 1997 WL 5392, at *1. In addition to the question there differing from the question here, the Foundation was an "auxiliary organization" under California law that operated for the benefit of California State University on its campus. *See* Cal. Educ. Code § 89901 (West 1977) (emphasis added). The Library is not an "auxiliary" of another City agency or entity. Additionally, under California law an auxiliary organization's obligations become the obligations of the State of California. No such entanglement between the Library and the City or Borough exists here. Therefore, Opinion 97-02A is also of limited value to my decision.

Finally, Plaintiff points to DOL Opinion 94-03A, in which the Addison Community Hospital (the "Hospital") was deemed an agency or instrumentality of the government. Addison Cmty. Hosp., Pens. Plan Guide (CCH) Op. No. 94-03A ¶ 23,891D (Feb. 17, 1994), 1994 WL 57175, at *1. There, political subdivisions of state and local government, acting pursuant to state statute, jointly established a hospital authority, the Addison Community Hospital Authority (the "Authority"), to operate and maintain the Hospital. That arrangement – the Authority's administration of the Hospital – persuaded the DOL that the Hospital's pension plan was a governmental plan under ERISA. The DOL did not focus on the features of the Hospital, such as its funding, board arrangement, or operations, but instead focused on the Authority's features, including the power to tax, a uniquely governmental function. It also noted that the Authority (plainly an instrumentality of government) controlled the Hospital's everyday operations. Based on the Authority's relevant features, and not the Hospital's, DOL concluded that the Hospital's

15

plan fell within ERISA's governmental exception. It seems likely that the DOL would have come out the other way had the Authority contracted with an independent entity to run the Hospital, hire the employees, and offer a pension plan. Here, there is no comparable authority that wields a taxing power and administers the Library. Therefore, Opinion 94-03A is also inapposite.[7]

In sum, the DOL opinions do not alter my analysis of the *Rose* factors, three of which favor Defendants; one of which favors Plaintiff; and two of which are neutral. On balance, Defendants have established that the disability and life insurance plan Plaintiff purchased through the Library is not a "governmental plan" under 29 U.S.C. § 1002(32).

My finding is further supported by an examination of Congress's reasons for including the governmental plan exemption when it enacted ERISA: (1) public plans generally contain more generous vesting provisions than private plans; (2) governments may use their taxing powers to fulfill their obligations to employees, which eliminates the need for minimum funding standards and plan termination insurance; and (3) ERISA's minimum funding and other standards might impose unacceptable costs on government entities. *Rose*, 828 F.2d at 914.

---

[7] Plaintiff attaches a City of New York Conflicts of Interest Board advisory opinion to its motion papers. (Wendle Affirm. Ex. E.) The Library is correct that this advisory opinion is limited in that it concludes that the Library should be treated as a governmental agency for the purposes of New York City Charter Section 2604(d)(6), a conflicts-of-interest provision discussing post-employment restrictions on City employees. (Doc. 40 at 21.) The advisory opinion does not relate to ERISA or its governmental plan exemption and is thus of almost no import here. Further, in clearing a City employee to work for the Library in a position that would otherwise violate the conflict of interest law, the Board did not mention the contractual relationship between the City and the Library. Moreover, the Conflicts of Interest Board's interpretation that the Library is an "arm" of local government seems to contradict the City charter's express provision that the Library is not an "agent" of the City. *See* N.Y.C. Charter § 2601(2) ("Agency . . . shall not include any court or any corporation or institution maintaining or operating a public library.").

Because there is no evidence that any of these considerations apply to the Library, my conclusion comports with Congress's purpose in enacting ERISA's governmental plan exemption.

## IV. **CONCLUSION**

For the reasons stated above, Plaintiff's motion to remand this case to New York State Supreme Court is DENIED. A status conference will be held in this case on May 9, 2019 at 11 a.m. The Clerk of Court is respectfully directed to terminate the pending motion. (Doc. 36.)

**SO ORDERED.**

Dated: April 18, 2019
       White Plains, New York

                                          *Cathy Seibel*
                                      CATHY SEIBEL, U.S.D.J.